# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN RE JONATHAN L. KATZ. | Case No. 3:06MC00008 |
| | **OPINION** |
| | By: James P. Jones |
| | Chief United States District Judge |

*William F. Gould, Assistant United States Attorney, Charlottesville, Virginia, for United States of America; Murray J. Janus, Bremner, Janus, Cook & Stone, Richmond, Virginia, and David L. Heilberg, Dygert, Wright, Hobbs and Heilberg, PLC, Charlottesville, Virginia, for Jonathan L. Katz.*

The question before the court is whether under the facts an attorney should be held in contempt for disobeying an order of the trial judge directing him not to refer to government witnesses as "liars" during closing argument in a criminal trial.

I

Jonathan L. Katz, an attorney at law, represented a defendant in a criminal prosecution in this court. Because of an event that occurred during the course of the jury trial, United States District Judge Norman K. Moon issued a show cause order directed to Katz charging him with contempt of court. Judge Moon thereafter

rescused himself and trial on the contempt charge was held before the undersigned on January 8, 2007. The case was taken under advisement and this Opinion constitutes the court's decision in the matter.

The basic facts in the case are not in dispute.

Attorney Katz is licensed to practice law in Virginia, Maryland, and the District of Columbia. He has practiced law for nearly two decades and has participated in numerous criminal and civil jury trials. Katz was retained to represent Louis Antonio Bryant, who was charged in this court with numerous federal drug offenses including conspiracy to distribute marijuana, crack cocaine, and powder cocaine; possession with intent to distribute marijuana; engaging in a continuing criminal enterprise; participating in a RICO organization; attempted murder in aid of a racketeering activity; and the use of a firearm during a drug trafficking offense.

These charges stemmed from Bryant's alleged involvement as the leader of a drug trafficking ring that operated in Charlottesville known as the "Westside Crew." The government's case was based in part on the testimony of cooperating witnesses who had been affiliated with Bryant and the Westside Crew. Bryant was tried together with three co-defendants, with each defendant represented by separate counsel.

On November 29, 2005, during closing arguments before the jury, Katz called a cooperating witness a liar. The government objected to Katz characterizing the witness as a liar and the objection was sustained by the court.

On the tenth day of the trial, a mistrial was declared after it was disclosed that a juror had read an account of the trial in a local newspaper and had talked about the article with two other jurors.

Katz continued his representation of Bryant and a new trial was scheduled. At this second trial, Bryant was tried alone and Katz was the only defense attorney. The trial consumed eight days of testimony. During closing arguments, on May 18, 2006, Katz repeatedly referred to certain government witnesses as liars over the course of his three and one-half hours of summation. Katz called such witnesses "cooperating liars."

Katz began his closing statement by arguing that the government had called "cooperating liars" to testify because of the "hundreds and hundreds and hundreds and hundreds of hours" it had invested investigating Bryant to no avail. (May 18, 2006 Tr. at 2-4.) Katz stated that "[i]t upset me, as I'm sure it upset Antonio, no less, to hear all these accusations and lies about him, all these lies by these cooperating witnesses, all these things that are not true." (*Id.* at 7.)

Katz also commented that "[i]t's a small town so all these liars know what's going on with this marijuana shipment." (*Id.* at 8.) Moments later he stated:

> Today, I'm going to tie it all together for you more than the overview I gave you the first time I spoke to you in opening statement because now I know which of the liars they were going to bring on to lie to you with those same hands that fired those guns, with those same hands that sold crack, with those same hands that signed their plea deals to seek help from the prosecutors.

(*Id.* at 12.)

Katz continued to argue that the "convicted liar[s] [are] stuck where they are" unless they "manufactur[ed] their words to please the prosecutors." (*Id.* at 13.) Aside from assailing the prosecutor for parading "cooperating liars" before the court, Katz also accused the Marshals Service of not doing "a damn thing to keep these cooperating liars separate" because they, like the prosecutor, are employed by the Justice Department. (*Id.* at 19.)

Throughout many portions of his argument, Katz imitated cooperating witnesses. He frequently speculated about their thoughts and motives in testifying and invented conversations. Eventually, Judge Moon instructed Katz as follows: "[Y]ou've got to stick to the evidence in the case. I've allowed you to go on and on. Don't make up conversations and stuff. It's not in the evidence." (*Id.* at 25.)

- 4 -

Katz also went on to reveal his personal beliefs to the jury by stating, "Do you think I'm telling you all this because I'm some bleeding heart, lefty, Commie pinko, from Silver Spring, Maryland, of all things? I can't convince you of his innocence if I don't believe in it. I believe." (*Id.* at 27.) To this remark Judge Moon responded by instructing Katz not to tell the jury what he personally believed.

In explaining the concept of reasonable doubt, Katz further referred to the government witnesses by stating:

> Reasonable doubt is every cooperating liar who's come in here and raised that lying hand of theirs. That's reasonable doubt. Reasonable doubt is knowing that you wouldn't let your child, your dog, your best friend, alone with any of one of those cooperating liars for even a split second. They are reasonable doubt.

(*Id.* at 34.)

Finally, after Katz had referred to the witnesses as being liars some thirty times during the course of his summation, Judge Moon instructed him as follows:

> Excuse me. Mr. Katz, I hate to interrupt again. I've allowed you great latitude, but it is not proper for you to call people liars. You may not do that. The prosecutor is not allowed to call witnesses liars, your witnesses liars. You're not allowed to call his witnesses liars. You may not disparage the witnesses, people in that manner.

(*Id.* at 37.) At this time Katz had only completed approximately one-third of his closing argument.

- 5 -

After a recess for lunch, Katz continued his argument and refrained from calling the cooperating witnesses "cooperating liars" or any variation of that term. However, in the final few minutes of his argument, he asked the jury to recall the film *The Wizard of Oz* and began to draw comparisons between that movie and his client's case. He referred to the wizard of the movie as "that lying piece of crap behind that curtain . . . that erstwhile -- that fake wizard . . . ." (*Id.* at 112.) He then compared the cooperating witnesses to the wizard. He likened himself to Toto, Dorothy's dog, and stated that like Toto it was his job "to show that what is really behind that curtain is people telling untruths, people telling fantasies." (*Id.*) After this statement, Katz concluded his argument by yelling loudly and dramatically, "No good liars." (*Id.*)

The court then recessed. When the proceedings resumed, outside the presence of the jury, Judge Moon advised Katz that his remark had been highly improper and in direct violation of its previous order not to call witnesses liars. Judge Moon then instructed the jury that the attorneys were not to state personal knowledge of facts or give their personal opinion as to the credibility of a witness or as to the guilt or innocence of the accused.

The following morning, when speaking to Katz at sidebar regarding his closing statement, Judge Moon told him:

> I want you to know that I am extremely disturbed of your flagrant contempt of the Court yesterday in the manner in which you did your summation when you screamed as loud as you could that the government witnesses were low down liars or words to that effect when I had cautioned you during your closing not to call these people liars. You have repeatedly done it. I let you go much too long. I was really derelict as a judge to allow you to call these people liars throughout the argument. I finally cautioned you and you said you would follow my instructions. Then you shouted as contemptuous as you could, and you couldn't have been any more deliberate in your violation of the Court's instructions and Canons of ethics.

(May 19, 2006 Tr. at 6-7.)

In response, Katz explained that he had not intended to disregard the court's order and that it "came out in the heat of battle." (*Id.* at 9-10.) He asked Judge Moon to postpone any decision on whether to hold him in contempt and to convene a future hearing where he could explain himself further and be represented by counsel.

On June 18, 2006, Judge Moon entered an order directing Katz to show cause why he should not be found in criminal contempt for failure to adhere to an explicit order of the court during his closing argument on May 18, 2006. On June 28, 2006, a hearing was held before Judge Moon in which Katz was represented by counsel.

At this hearing, Katz stated that the case had been stressful, that he had been sleep deprived, and that he simply did not remember the court's order at the time he

- 7 -

employed the *The Wizard of Oz* analogy and ended by calling the cooperating witnesses, "No good liars." Judge Moon took the matter under advisement.[1]

On October 2, 2006, Katz, by counsel, filed a motion requesting that Judge Moon recuse himself from the contempt case. On October 10, 2006, Judge Moon granted the motion. The case was subsequently transferred to the undersigned district judge. On January 8, 2007, the court held a full evidentiary hearing on the matter.[2]

---

[1] After hearing Katz's excuses for failing to follow the court's order, Judge Moon stated:

> I let this thing go on far beyond what I would ever have allowed before -- allowed anyone else to do before I warned you.
>
> And then, you know, you spent four minutes, probably, or more, building up to your punch line. I mean, it didn't -- what would have been the punch line if you didn't come out with the "liar" statement? . . . .
>
> This is not a personal thing with me. . . .
>
> . . . .
>
> And I don't think I have ever held a lawyer in contempt for any kind of action in court. But, on the other hand, I don't think -- I have never had anybody as disobedient -- overtly disobedient to an order as in this case.

(June 28, 2006 Tr. at 19-21.)

[2] Although the record before Judge Moon may have provided an adequate basis for summary disposition of this case, once Judge Moon recused himself, a separate hearing was mandated by Rule 42 of the Federal Rules of Criminal Procedure. Since the alleged misconduct occurred before Judge Moon and not in the undersigned's presence, it was not direct contempt. "Indirect contempt is contumacious behavior occurring beyond the eye or hearing of the court and for knowledge of which the court must depend upon the testimony of third parties or the confession of the contemnor." *United States v. Marshall*, 451 F.2d 372,

- 8 -

At the contempt hearing Katz testified on his own behalf. He stated that his child had been only two months old at the time of the trial and he had been staying in Charlottesville away from his family and was tired and stressed at the time of closing argument. He testified that he had not intentionally violated Judge Moon's order regarding calling witnesses liars, but that he simply had forgotten the order in the excitement of the moment.

II

This court has the power to punish by fine or imprisonment, or both, for "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C.A. § 402 (West 2000 & Supp. 2006). A finding of criminal contempt is proper where it is proved beyond a reasonable doubt that (1) the court gave a specific order that left no uncertainty in the minds of those that heard it; (2) that the order was violated; and (3) that the violation of the order was willful. *United States v. Linney*, 134 F.3d 274, 278 (4th Cir. 1998).

The issue in this case is not whether it is proper for an attorney to describe a witness as a being a liar. Court opinions are not uniform on this question; it is more

---

373 (9th Cir.1971). "Direct contempt provides for summary disposition; indirect contempt requires notice and hearing." *In re Heathcock*, 696 F.2d 1362, 1365 (11th Cir. 1983).

likely to be held improper when the context shows that it is used as an expression of personal opinion by the attorney as to a witnesses' credibility. *See Moore v. United States*, 934 F. Supp. 724, 728-29 (E.D. Va. 1996); Craig Lee Montz, *Why Lawyers Continue to Cross the Line in Closing Argument: An Examination of Federal and State Cases*, 28 Ohio N.U.L. Rev. 67, 116-20 (2001).[3] Even when not coupled with counsel's personal belief, however, the word has "potentially emotive effects" and "if used excessively and intemperately, [may] amount to improper argument." *Moore*, 934 F. Supp. at 728, 729. Under the facts here, Judge Moon was clearly justified in directing Katz to stop using the word in his description of the government's witnesses.

Regardless, Katz had the duty to obey Judge Moon's order. *See Maness v. Meyers*, 419 U.S. 449, 459 (1975) (stating that an order by a court with jurisdiction, particularly during trial, "must be complied with promptly and completely" until

---

[3] It is a long-standing rule of professional ethics that an attorney must not state a personal opinion on the credibility of any witness. *See*, e.g., Am. Bar Ass'n, *Standards for Criminal Justice*, *Prosecution Function and Defense Function Standard* 4-7.7(b) (3d ed. 1993) ("Defense counsel should not express a personal belief or opinion in his or her client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence."); Va.Code of Professional Responsibility, DR 7-105C(4) ("In appearing in his professional capacity before a tribunal, a lawyer shall not [a]ssert his personal opinion as to the justness of a cause, as to the credibility of a witness, . . . or as to the guilt or innocence of an accused."); Md. Lawyer's Rules of Professional Conduct, Rule 3.4(e) ( "A lawyer shall not, in trial, . . . assert personal knowledge or facts in issue except when testifying as a witness, or state a personal opinion as to the . . . credibility of a witness . . . or the guilt or innocence of an accused.").

reversed). Katz readily admits and the record reflects that Judge Moon specifically instructed him not to call witnesses liars. Katz also agrees that he understood the order and that he violated it in the waning minutes of his closing argument. Thus, the critical question in this case is whether Katz acted "willfully" in violating the order.

Katz contends that he lacked the requisite level of intent to be found guilty of criminal contempt. In particular, he asserts that he simply forgot Judge Moon's instruction. However, from the evidence presented, I find there is sufficient evidence to establish as a matter of fact that Katz violated the order willfully, contumaciously, and with a wrongful state of mind.

III

Katz asserts that his disobedience to Judge Moon's order was due to forgetfulness attributable to the excitement of the trial, coupled with his stress and fatigue. Certainly, the trial was lengthy and somewhat complex. However, Katz also served as counsel in the trial that lasted ten days and ended in a mistrial. Furthermore, Katz is not a novice at the practice of law. He has handled hundreds of criminal and civil cases in court and has brought dozens to trial. The fact that the Bryant case was his first felony trial in federal court is not a defense to his behavior.

Moreover, the transcript of Katz's closing argument greatly elucidates his intent in violating the court's order. "[T]he question of one's intent is not measured by a psychic reading of [the defendant's] mind but by the surrounding facts and circumstances." *United States v. Bolden*, 325 F.3d 471, 494 (4th Cir. 2003) (internal quotation omitted). As the record illustrates, Katz's violation of the court order was more than a gaffe. In particular, the final minutes of his closing statement reveal that Katz's use of the phrase "no good liars" was not done through inadvertence.

Katz concluded his three-and-one-half-hour summation by referring to *The Wizard of Oz*. Up until this point, he had complied fully with the court's order. He carefully and thoughtfully analogized this movie to his client's case. In so doing, he compared the cooperating witnesses to the wizard, whom he referred to as "that lying piece of crap behind that curtain," and himself to Toto, the dog who pulled the curtain away to reveal the wizard's identity. Katz use of this analogy was not impromptu; it was contrived.[4] His entire purpose in employing the analogy was to develop a memorable climax to his lengthy summation by once again disparaging the

---

[4] Katz testified that he prepares his closing arguments by outlying the themes and points he wishes to convey to the jury. He also admitted that he came up with the idea of using an analogy from *The Wizard of Oz* in his closing argument days before he delivered it. (June 28, 2006 Tr. at 5.)

- 12 -

cooperating witnesses while casting himself as the hero who revealed the truth to the jury.

My determination is supported not only by the content of the statement he used to violate the court's order, but by the manner in which he uttered that statement. The record reflects that this was not simply a slip of the tongue; rather, it was a calculated theatrical stunt on his part. The evidence indicated that Katz had been speaking at a normal tone of voice and that he concluded his remarks by loudly yelling, "No good liars." The manner in which he elevated the volume of his voice for the sake of emphasis is telling.

Furthermore, determinations regarding a party's intent can depend largely on an assessment of that party's credibility and demeanor by the finder of fact. *See Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987). I do not find Katz credible nor his explanations convincing. In light of his testimony before me, I do not accept his contention that he simply forgot about the order in the excitement of the moment.

Based on the evidence, I find that Katz was cognizant of Judge Moon's order and simply decided not to follow it as a strategy to make his closing statement more effective. Under these facts, a finding of criminal contempt "falls within the ambit

of permissible maintenance of judicial decorum." *United States v. McMahon*, 104 F.3d 638, 645 (4th Cir. 1997) (internal quotation omitted).

IV

For the reasons stated, I find Jonathan L. Katz guilty of criminal contempt in violation of 18 U.S.C.A. § 401. The appropriate punishment is a fine of $2,500.[5] A separate judgment will be entered.

DATED: March 7, 2007

/s/ JAMES P. JONES
Chief United States District Judge

---

[5] In levying a fine, the court should consider the defendant's financial resources. *See* 18 U.S.C.A. § 3572(a)(1) (West 2000). While there was no express evidence presented on that question, in light of Katz's extensive professional practice, and the relatively small amount of the fine, I find the evidence sufficient to support a finding that Katz has the ability to pay the fine. *See United States v. Linney*, 134 F.3d at 282. The Sentencing Guidelines do not suggest a guideline range for this type of criminal contempt, *see U.S. Sentencing Guidelines Manual* § 2J1.1 (2006), and no presentence investigation report is needed in light of the evidence of record. *See* Fed. R. Crim. P. 32(c)(1)(A)(ii).